# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

DAVID SEARS,

                                 Plaintiff,

        v.                                       8:12-CV-570
                                                         (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                 Defendant.

---

MARK A. SCHNEIDER, ESQ., for Plaintiff
JOANNE JACKSON, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

Plaintiff applied for both Social Security Disability Benefits and Supplemental Security Income ("SSI") benefits on April 29, 2009,[1] alleging disability, beginning

---

[1] The date listed on the actual applications is May 15, 2009, the date that the applications were completed. (T. 89-98). However, the date used in the initial denial documents and by the Administrative Law Judge in his decision is April 29, 2009. It is possible, although no one mentions it, that April 29, 2009 was the date plaintiff "protectively filed" his applications for benefits. When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

December 20, 2008,[2] based upon Chronic Obstructive Pulmonary Disease ("COPD").[3] The applications were denied initially on November 18, 2009. (Administrative Transcript ("T") 40-41). Plaintiff requested a hearing, which was held on September 22, 2010 before Administrative Law Judge ("ALJ") Carl E. Stephan. (T. 23-39). On October 28, 2010, the ALJ issued his decision finding that plaintiff was not disabled. (T. 12-19). The ALJ's decision became the final decision of the Commissioner on March 9, 2012, when the Appeals Council denied plaintiff's request for review, notwithstanding the submission of additional evidence by plaintiff. (T. 1-6).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)    The ALJ violated the Treating Physician Rule in rejecting Dr. Woods McCahill's opinion. (Pl.'s Br. 12-14) (Dkt. No. 13).

(2)    The ALJ erred in determining that plaintiff had the residual functional capacity ("RFC") for light work. (Pl.'s Br. 14-16).

(3)    The Commissioner erred as a matter of law in concluding that plaintiff was not disabled by Fibromyalgia. (Pl.'s Br. 16-17).

(4)    The ALJ erred in finding that plaintiff's complaints of pain were not credible to the extent alleged. (Pl.'s Br. 17-18, 20-24).

(5)    The ALJ erred in failing to consider the side effects of plaintiff's medications. (Pl.'s Br. 18-19).

---

[2] The court notes that plaintiff's original application for SSI benefits alleges an onset date of August 20, 2007, however, it is clear that plaintiff is not alleging disability onset until December 20, 2008. (*See* T. 95 (SSI Application), T. 12 (ALJ's Decision)).

[3] Plaintiff's application raised only the COPD as a disabling condition (T. 89-98, 40-41), however, in his "Disability Report," he alleges Emphysema, COPD, and "blocked vessels in heart [sic]." (T. 115). Plaintiff also alleged that he suffered from rheumatoid arthritis, which has more recently been determined to be fibromyalgia. (T. 222, 229).

(6)     The ALJ erred when he failed to use a Vocational Expert to determine whether plaintiff could perform other work in the national economy. (Pl.'s Br. 19-20).

(7)     The ALJ failed to fully develop the record. (Pl.'s Br. 24-25).

(8)     The Appeals Council erred when it failed to consider and analyze the material evidence that plaintiff submitted after the ALJ's hearing. (Pl.'s Br. 25-30).

(9)     The ALJ erred in determining that plaintiff was not disabled because he was not treated by specialists. (Pl.'s Br at 30-30).

Defendant argues that the ALJ's decision is supported by substantial evidence and must be affirmed. (Dkt. No. 15). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.[4]

## III.  **APPLICABLE LAW**

### A.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless

_____

[4] In the interest of clarity and judicial economy, the court has addressed some of plaintiff's individual arguments together.

of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

4

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's

decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.  FACTS

Plaintiff's counsel has stated the medical and vocational facts in his brief. (Pl.'s Br. 1-7).  Defense counsel has incorporated the facts contained in the ALJ's decision as well as the facts stated by plaintiff's counsel "but without any inferences, contentions, or conclusions asserted by Plaintiff." (Def.'s Br. at 1).  This court will also incorporate the facts as stated by plaintiff's counsel and the ALJ, with any exceptions as noted in the discussion below.

## V.  TREATING PHYSICIAN

### A.  Legal Standard

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the opinion is rejected.  *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### B.  Application

Plaintiff's treating physician is general practitioner, Dr. Woods McCahill, Jr.  In his decision, the ALJ discussed Dr. McCahill's reports, and correctly cited the

"Treating Physician Rule." (T. 17). The ALJ also correctly pointed out that notwithstanding the deference given to a treating physician's medical diagnosis,

> statements that a claimant is 'disabled,' 'unable to work,' can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings . . . requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner.

(*Id.*) *See also Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (citations omitted) (no deference due to conclusory statements by treating physician that a plaintiff is "disabled").

The record contains two of Dr. McCahill's prescription slips, simply stating that plaintiff was "totally disabled" because of his COPD. (T. 221). One of these slips was dated in August of 2009 and the other in February of 2010. (*Id.*) In a letter, written by Dr. McCahill to plaintiff's attorney on July 27, 2010, Dr. McCahill also stated that plaintiff was "incapable of performing any *active* work. He would be capable of performing sedentary work, *but I rather suspect his education level wouldn't leave many options open to him in this area.*" (T. 222) (emphasis added).

The ALJ rejected Dr. McCahill's conclusory statements that plaintiff was disabled, and that his education would prevent him from obtaining a sedentary job. (T. 17). The ALJ stated that Dr. McCahill's statement that plaintiff could not perform "active" work was not supported by objective medical evidence, and that Dr. McCahill did not perform any objective tests to evaluate either plaintiff's COPD or the effects of

his rheumatoid arthritis.[5] (*Id.*)  The prescription slips do not mention the arthritis, although the letter includes both a reference to the rheumatoid arthritis and the peripheral vascular disease. (T. 221, 222).  The ALJ further stated that Dr. McCahill never indicated any functional limitations associated with the arthritis, nor did he perform any objective tests for either the COPD or the arthritis. (T. 17).  Thus, the ALJ rejected the conclusory statements of "total disability," but considered Dr. McCahill's narrative reports and gave them some, but not controlling weight.

Plaintiff's counsel argues that Dr. McCahill's findings support total disability and are consistent with the consultative physician, Dr. Barry Kilbourne, M.D., whose November 2009 opinion was given "great weight" by the ALJ.  Dr. Kilbourne stated that plaintiff had moderately severe COPD, and that he would be capable of light work, without exposure to dust, prolonged heat or cold or working at a high rate of speed. (T. 193).  Dr. Kilbourne further stated that plaintiff might be able to tolerate slow, steady work, but "any sustained high rate of physical activity would not be tolerated, and a dusty environment would not be tolerated. (*Id.*)  Dr. Kilbourne stated that plaintiff might require time for Ventolin usage if he started wheezing, and that "employers may not allow work at less than sustained rate *especially if he was doing manual work.*" (*Id.*) (emphasis added).

In giving Dr. Kilbourne's opinion great weight, the ALJ noted that Dr. Kilbourne made his determination based upon his own objective pulmonary function

---

[5] The ALJ did find that the arthritis was a "severe" impairment at step two of the disability analysis. (T. 14).

test, and that even with the positive findings, Dr. Kilbourne only diagnosed moderate COPD. (T. 17, 192). Dr. Kilbourne also noted that plaintiff did not appear short of breath, and he did not see any evidence of wheezing even though plaintiff's breath sounds were poor. (T. 191). Although Dr. Kilbourne put restrictions on the type of light work that plaintiff could perform, including limitations as to dust, prolonged heat or cold, or "working at a high rate of work for any period of time," he was specifically referring to "carpenters." Dr. Kilbourne stated that plaintiff might not be allowed to work at a "less than sustained rate, if he was doing the *manual labor which he states he was doing before.*" (T. 192). Dr. Kilbourne's comment was meant to indicate that plaintiff could not perform his previous occupation, a fact that is not contested.

No deference is due to Dr. McCahill's statement that plaintiff was "disabled." *Michels v. Astrue*, 297 F. App'x at 76. Medical source opinions only discuss impairments and their diagnoses. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ultimate question of disability, given plaintiff's age, education, and prior work experience is the province of the Commissioner. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted). *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (discussing medical source opinions on issues reserved to the Commissioner; the application of vocational factors is for the Commissioner). The Commissioner considers data provided by physicians, but draws his own conclusions as to whether the data supports a finding of disability. *Id.* (citing *Snell v. Apfel*, 177 F.3d at 133). To the extent that the medical reports are inconsistent, conflicts in the evidence are for the ALJ to resolve. *Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2008) (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 399 (1971)).  The ALJ need not reconcile every shred of evidence in support of his decision.  *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 78–79 (N.D.N.Y. 2005) (citations omitted).  The ALJ in this case, as further discussed below, properly evaluated the evidence and resolved any conflicts in favor of Dr. Kilbourne's opinion and determined that plaintiff could perform light work with the limitations cited.

Plaintiff argues that the ALJ should have "at least" developed evidence about plaintiff's education based upon Dr. McCahill's statement.[6]  Plaintiff's "education" was taken into account when the ALJ utilized the Medical Vocational Guidelines in determining at Step 5 of the sequential evaluation that plaintiff could perform other work in the national economy. (T. 18-19).  The ALJ specifically found that plaintiff had a "limited" education, but could communicate in English, and that transferablility of skills was not an issue because even plaintiff's former work was "unskilled." (T. 18).  Thus, even though Dr. McCahill is plaintiff's treating physician, his comment about plaintiff's "education level" preventing him from doing work is beyond Dr. McCahill's expertise or authority for purposes of the disability analysis.

Additionally, Dr. Kilbourne's statement about the speed at which plaintiff could

_____

[6] Plaintiff makes a separate argument that the ALJ should have "developed the record" regarding plaintiff's intelligence.  An ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999);  20 C.F.R. §§ 404.1512(d), 416.912(d). ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.")  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination.  20 C.F.R.§§ 404.1512(e), 416.912(e). However, for the same reasons stated in this section, the ALJ did not fail to adequately develop the record regarding plaintiff's education or "intelligence."

work had nothing to do with plaintiff's education, but related to whether a construction worker would be able to work at a slower pace or be allowed to use his Ventolin if necessary.  Dr. Kilbourne stated that plaintiff might not be able to work at "any sustained high rate of physical activity." (T. 192).  The definition of light work does not involve a "high rate of physical activity."[7]  Therefore, the ALJ's decision to reject Dr. McCahill's finding of "total disability" is supported by substantial evidence in the record.

## VI.  RESIDUAL FUNCTIONAL CAPACITY/CREDIBILITY

### A.    Legal Standards

#### 1.    Residual Functional Capacity ("RFC")

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F.

---

[7] Dr. Kilbourne actually stated that he knew "carpenters with far worse lung disease who could work at a slow rate if they were not exposed to heavy dust." (T. 192).  The ALJ found that plaintiff could not perform his previous work in any event.  Dr. Kilbourne's report is therefore consistent with an ability to perform light work, with the environmental restrictions included.

Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

## 2.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929. *See also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a

claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

## B. Application

In determining that plaintiff had the ability to perform light work as long as he avoided exposure to extreme heat, cold, and dust, the ALJ considered the entire record and made a credibility finding based upon plaintiff's testimony and upon inconsistencies between plaintiff's alleged limitations and his activities. Plaintiff now argues that he is limited to less than sedentary work "as a matter of law," based upon a combination of exertional and non-exertional impairments, including COPD, pain, chronic fatigue, Fibromyalgia, and low intelligence. (Pl.'s Br. at 16).

While it is true that the ALJ must consider the plaintiff's impairments "in combination," the court notes that no physician ever placed any limitations on

plaintiff's activities based on any impairment other than plaintiff's COPD. Although plaintiff was tested for some cardiac issues, his 2007 stress test showed mild exercise intolerance, and his 2009 stress test revealed only a "mildly abnormal study." (T. 165). There were no limitations placed on plaintiff due to his alleged cardiac impairment. Dr. McCahill never mentions "chronic fatigue,"[8] and there is absolutely no discussion of "low intelligence" or how it might affect plaintiff's abilities, other than Dr. McCahill's comment that there might not be many opportunities for work for an individual with plaintiff's education. Although the records mentioned rheumatoid arthritis, there is no indication that plaintiff's activities were limited by his arthritis to the extent that he could not perform light work. Plaintiff was not diagnosed with fibromyalgia until *after* the ALJ's hearing, and the ALJ could not have discussed a diagnosis that was not in the record.[9] Thus, the ALJ did not fail to properly consider the "combination" of plaintiff's impairments.

It is interesting to note that notwithstanding Dr. McCahill's statement that plaintiff was totally disabled, a review of Dr. McCahill's own notes indicate that plaintiff was "still working" in construction in July of *2009*. (T. 185). Although it appears clear that plaintiff stopped working in December of 2008, the fact that Dr. McCahill's reports continued to state that plaintiff was still working well into 2009 shows a lack of accuracy in those reports. (*See* T. 179, 180, 182, 184, 185).

----

[8] In his disability report, plaintiff states that he stopped working, in part, due to "chronic fatigue." (T. 115). No doctor's report diagnoses or discusses chronic fatigue.

[9] To the extent that the plaintiff claims that the Appeals Council should have remanded the case for further hearing or should have granted benefits outright due to the subsequent diagnosis of fibromyalgia, I will discuss the issue in the "new evidence" section.

The ALJ noted that approximately one month prior to plaintiff's disability onset, Dr. McCahill reported that plaintiff suffered "thoracic muscle strain" from pulling a deer out of the woods for half a mile, but that he got out of breath while doing that. (T. 151). Dr. McCahill's report, dated November 3, 2008 also stated that plaintiff's lungs were "reasonably clear." (*Id.*) In fact, several of Dr. McCahill's reports state that plaintiff's lungs were clear. (T. 177, 179, 180, 185). Dr. McCahill spoke to plaintiff about quitting smoking and mentioned plaintiff's smoking in each report. (*Id.*)

On November 21, 2008, Dr. McCahill noted that plaintiff was still able to go hunting. (T. 16, 148). The ALJ stated that plaintiff suffered from chronic conditions, and nothing "acute" happened to him between November of 2008, when he was able to go hunting, and December 20, 2008, when he states that he had to quit his job due to his medical condition. (T. 16). The ALJ correctly reasoned that plaintiff would still have maintained the ability to perform the activity of hunting after his onset date,[10] making plaintiff's claim of more severe restrictions less credible. (*Id.*)

This finding is supported by Dr. McCahill's January 2009 report, stating that plaintiff was carrying wood up stairs, and this may have caused some chest pain. (T. 179). The doctor noted that plaintiff had an "unremarkable cath[eterization]"[11] three

---

[10] At the hearing, plaintiff testified that, although he had not been hunting for a couple of years, he currently had a hunting license, still went fishing, had a turkey stamp, and a muzzle loader. (T. 34). He stated that the last time he went hunting, he only stayed in the tree stand for about an hour because his arthritis began to bother him. (T. 34).

[11] The court also notes that plaintiff has exaggerated his alleged cardiac impairment. At one point, plaintiff alleged he had "blocked vessels in his heart." (T. 115). The medical records show that plaintiff's heart catheterization was found to be "unremarkable." (T. 179). Blocked vessels in the heart would not have resulted in an "unremarkable" catheterization. There would have been some blockage noted. However, none of the medical reports refer to blocked vessels. On February 23,

years before, and that he was "trying to quit smoking." (*Id.*) Once again, carrying wood up stairs is totally inconsistent with the limitations that plaintiff alleged he suffered, and Dr. McCahill's report continued to state that plaintiff was working construction at the time. The ALJ's assumption that plaintiff's condition was the same in December of 2008 as when he was hunting in November of 2008 is supported by Dr. McCahill's statement on December 22, 2008 that plaintiff's "breathing is bad but it hasn't gotten any worse," and as stated above, plaintiff's lungs were clear on examination. (T. 177).

The ALJ gave Dr. Kilbourne's assessment great weight since he performed his own pulmonary tests and found that plaintiff could probably perform light work without exposure to temperature extremes and dust. Dr. Kilbourne also stated that the plaintiff's COPD would be "likely to improve as he continues to stop smoking," even though he would never return to normal. (T. 192). The ALJ's finding is supported by the medical record. The ALJ found that plaintiff's impairments might cause pain and other limitations, but that his allegations were "not fully persuasive." (T. 18).

Plaintiff makes a separate argument that the ALJ erred in determining that plaintiff was not disabled because he was not treated by specialists. (Pl.'s Br. at 30-31). Plaintiff cites the law discussing the failure to follow prescribed treatment and

---

2009, Dr. McCahill stated that one of plaintiff's diagnoses was Coronary Artery Disease, manifested by the positive stress test, although the ischemic area was small "and the cardiologist thought the test indicated a good prognosis." (T. 180). In November of 2009, Dr. Kilbourne stated that there was "[s]ome suspicion of coronary artery disease but he had a heart cath and this was thought to be musculoskeletal in nature. He may have had some arrhythmias." (T. 191). There are multiple reports by Dr. McCahill, stating that the 2007 catheterization was "normal." (T. 182, 184, 185, 187, 226, 228, 231).

states that plaintiff never *refused* to see a specialist and argues that plaintiff was examined at various times by a specialist even for his eyes.[12] (*Id.*)  Plaintiff's argument is misplaced.

The ALJ did not deny disability benefits simply because plaintiff was not examined by, or did not see, specialists.  Rather, plaintiff's failure to seek specialized treatment was considered as *one* of many factors in determining that the extent of plaintiff's claimed limitations was not credible.  In the same paragraph, the ALJ also mentions plaintiff's failure to comply with the doctors' advice to quit smoking as being "inconsistent with his allegations of disability due to difficulty breathing."[13] (T. 16-17).  The regulations governing the analysis of pain and other symptoms specifically provide for the consideration of the type of treatment, other than medication, that plaintiff has obtained for his condition. 20 C.F.R. §§ 404.1529 (c)(3)(v), 416.929 (c)(3)(v).  Specialized treatment would be considered one "type" of treatment obtained by a plaintiff.  Thus, the ALJ's statement, in the context of his credibility finding, was not error.

Plaintiff also argues that he was unable to work because of "the side effects of his medications." (Pl.'s Br. at 18-19).  Plaintiff's counsel cites various "side effects"

---

[12] Plaintiff's eyesight is not an issue in this case.  He saw the specialist when he was concerned about the Plaquenil affecting his "night vision." (T. 239).  There are no reports from any eye specialists in the record.

[13] The court notes that, as late as August 30, 2011, after the ALJ's decision, Dr. McCahill stated that plaintiff still smoked one pack of cigarettes per day, smoked his first cigarette within five minutes of waking up, and in response to the question of whether he was "interested in quitting," responded that he was not "ready to quit." (T. 234).  However, at the hearing, plaintiff testified that he had been trying to quit smoking, but it was the "cravings" that "kill [him]." (T. 36).

that are caused by the medications that plaintiff takes.[14]  However, in a Disability Report completed by plaintiff, the only medications that plaintiff alleged gave him any side effects were Darvocet, which he took for pain, and Spiriva for his COPD. (T. 119).  The report states that the Darvocet made plaintiff "really dizzy and light headed," and the Spiriva gave him dry mouth. (T. 119).  Although plaintiff's counsel notes that "Tiredness and drowsiness are known side effects of Atenolol,"[15] and plaintiff testified that the Atenolol made him "real tired," plaintiff specifically wrote "NONE" next to Atenolol in the column entitled "Side Effects You Have." (T. 119). On December 13, 2010, Dr. McCahill stopped the Darvocet prescription.[16] (T. 240). At that time, Dr. McCahill stated that plaintiff "was using Darvocet for pain." (T. 239).

Counsel also lists sensitivity to light as a side effect of Hydroxychloroquine.[17] (Pl.'s Br. at 19 n.5).  At the hearing, plaintiff testified that "now" his eyes were " real sensitive to bright light, so that he sees an eye doctor every six months. (T. 33). Plaintiff also testified that the "side effects is [sic] that it kind of like burns the retinas

---

[14] The side effects of medication are also listed as a consideration in the determination of credibility. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

[15] (Pl.'s Br. at 20 n.6).

[16] Dr. McCahill originally prescribed Darvocet (as needed) on November 3, 2008 (before plaintiff's disability onset date) for plaintiff's musculoskeletal pain from pulling the deer out of the woods. (T. 151).  The original prescription did not contain refills. (*Id.*)  On April 28, 2009, Dr. McCahill stated that he was going to "try Darvocet" because Ibuprofen was bothering plaintiff's stomach. (T. 182).  The record stated that he would "start Darvocet." (*Id.*)

[17] Plaintiff's counsel refers to Hydroxychloroquine, and the court notes that Plaquenil was name of the Hydroxychloroquine that plaintiff was taking. (*See e.g.* T. 239).  Plaquenil is used to treat arthritis and some auto-immune diseases. *See* www.webmd.com/drugs/drug-6986-Plaquenil.

18

out of your eyes . . . ."[18]  However, on December 13, 2010 (after the ALJ's decision),

Dr. McCahill stated that plaintiff had an "eye follow up and got some difficulty with

*night vision* and went off plaquenil" but gave him a refill of the medication at that

time. (T. 239) (emphasis added).  On August 30, 2011, Dr. McCahill noted that

plaintiff was not taking the Plaquenil. (T. 234-35).  On September 23, 2011, Dr.

Flinkenstein stated that plaintiff had tried Plaquenil, that it only helped a little, and

discontinued that medication because he noticed "increased glare." (T. 231).

There is no indication that the sensitivity to "bright" light would further reduce

plaintiff's ability to do light work, and it is clear that plaintiff never told the doctors

the extent of the side effects from plaquenil to which he testified at the hearing.  This

inconsistency also supports the ALJ's credibility determination.  In any event, plaintiff

discontinued the drug.  Thus, while the side effects of medications must be considered,

there is no indication in this case that any of the alleged side effects hampered

plaintiff's ability to work.[19]  Thus, the ALJ properly found that plaintiff could perform

light work with the restrictions noted and correctly found that plaintiff could not return

to his former work, proceeding to Step 5 of the disability analysis.

---

[18] (T. 33).

[19] There is also reference in the record to plaintiff's inability to tolerate Chantix, a drug to help plaintiff stop smoking.  Chantix made plaintiff nauseous, but he stopped using it even before the alleged onset date of his disability. (*See e.g.* T. 148, 149, 231).  The court notes that on December 22, 2008, January 26, 2009, February 23, 2009,  April 28, 2009,  plaintiff was not taking the Darvocet or any other medications that gave him side effects. (T. 177, 179, 180, 182).  Plaintiff was prescribed the Darvocet for his musculoskeletal chest pain on April 28, 2009. (T. 182).  Dr. McCahill did note that ibuprofen bothered plaintiff's stomach, but this is not the type of side effect that would prevent plaintiff from performing light work. (T. 182).  There is no discussion of other side effects in the medical records.

# VII. MEDICAL VOCATIONAL GUIDELINES/VOCATIONAL EXPERT

## A. Legal Standards

Once the plaintiff shows that he cannot return to his previous work, the Commissioner must determine that the plaintiff's RFC allows him to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (citation omitted). In the ordinary case, the ALJ meets this burden by utilizing the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567, 416.967. Each exertional category of work has its own Grid. The Grid for each exertional category then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

Where a plaintiff's impairments are only exertional, the Grids may be used exclusively. *Id.* However, exclusive reliance on the Grid is not appropriate if the medical vocational guidelines "fail to adequately describe a claimant's particular limitations." *Id. See* 20 C.F.R. Part 404, Subpt. P, App. 2, 200.00(e). Where there are "discrepancies" between the claimant's abilities and the Grid factors, where the claimant's exertional impairments are compounded by non-exertional impairments that

significantly limit the range of work an individual can perform, or where there is no substantial evidence that a claimant can perform the full range of a particular category of work, then the relevant facts are to be considered in light of the vocational considerations outlined in the regulations at 20 C.F.R. §§ 404.1569(a), 416.969(a).

If a claimant cannot perform the full range of an exertional category of work, then an individual assessment, using the services of a Vocational Expert, may be required. *Zorilla*, 915 F. Supp. at 667 (citing *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)); 20 C.F.R. §§ 404.1566, 416.966. A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983).

## B. Application

In this case, the ALJ found that plaintiff could perform light work with the additional non-exertional restriction to avoid extreme exposure to heat, cold, and dust. The ALJ also found that these additional restrictions had "little or no effect on the occupational base of unskilled light work." (T. 19). Thus, the ALJ used the Grid for light work and determined based upon plaintiff's age, education, and prior work experience, that plaintiff was not disabled. (*Id.* (citing "Medical Vocational Rule 202.17")); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.17.

Social Security Ruling 85-15 states that where the claimant has a medical restriction to avoid "excessive amounts" of "noise, dust, etc., the impact on the broad

world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." SSR 85-15, 1985 WL 56857, at *8 (1985). Included in the list of environmental limitations in the ruling are "extremes of temperature." *Id. See also Stanton v. Barnhart*, No. 01 Civ. 3486, 2003 WL 1900855, at *7 (S.D.N.Y. 2003) (stating that because most job environments do not involve exposure to fumes, odors, dust, gases, or poor ventilation, the ALJ's conclusion that the non-exertional limitations did not significantly restrict the plaintiff's ability to perform work, and reliance on the Grids was justified).

In this case, the ALJ correctly found that plaintiff's additional limitations did not affect his ability to perform a full range of light work, his use of the Grid was proper, and a vocational expert was not required.

## VIII. EVIDENCE SUBMITTED AFTER THE ALJ'S DECISION

### A.    Legal Standards

The Social Security regulations require the Appeals Council to consider additional evidence that was not before the ALJ, if the evidence is new, material, and relates to the period on or before the date of the ALJ's hearing decision.[20] *Ferguson v. Astrue*, No. 1:12-CV-183, 2013 WL 639308, at *2 (N.D.N.Y. Feb. 21, 2013) (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)). *See* 20 C.F.R. §§ 404.970(b) and

---

[20] This standard is slightly different than the standard utilized for new evidence that is presented to the court that was not before the agency at all. In that case, in addition to being new and material, there must be "good cause" for not presenting the evidence at the agency level. *See Tirado v. Bowen*, 842 F. 2d 595, 597 (2d Cir. 1988). There is a split of authority regarding this standard. Several circuits hold that the good cause requirement should be imposed even when the new evidence was submitted to the Appeals Council. *See Adkins v. Barnhart*, No. 2:02-CV-87, 2003 WL 21105103, at *5 n.5 (S.D. W. Va. May 5, 2003) (discussing cases).

416.1470(b).  The regulations provide that if the evidence is new and material, the Appeals Council will review the case if "it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b) and 416.1470(b).

Even if the Appeals Council denies plaintiff's request for review based on the new evidence, that evidence becomes part of the administrative record to be considered on judicial review. *Id.*  On judicial review, the court reviews the entire administrative record and still determines whether there is substantial evidence to support the decision of the Commissioner. *Perez v. Chater*, 77 F.3d at 46.

### B.    Application

In this case, the ALJ's decision was dated October 28, 2010.  By letter, dated January 27, 2012, plaintiff's counsel submitted additional medical records to the Appeals Council. (T. 225).  The records dated from October 4, 2010[21] until November 21, 2011. (T. 226-76).  On November 2, 2011, rhueumatologist, Dr. Flinkenstein diagnosed plaintiff with Fibromyalgia for the first time. (T. 228-29).  Plaintiff argues that the Commissioner erred "as a matter of law" in not determining that plaintiff was disabled based upon this diagnosis, and that the Appeals Council had "an obligation to address it."

The court would first point out that the diagnosis of fibromyalgia, in itself, does not necessarily require a finding of disability.  Plaintiff cites *Green Younger v.*

---

[21] Technically, this report from Dr. McCahill is not "new" because it was written a few weeks prior to the ALJ's decision. (T. 243-44).  The court will consider it in any event.

*Barnhart*, 335 F.3d 99, 107-108 (2d Cir. 2003) for the proposition that fibromyalgia is disabling. In *Green Younger*, the Second Circuit sent the case back to the Commissioner for calculation of benefits. However, the reason for the remand was not simply that the ALJ improperly failed to credit plaintiff's complaints of pain from fibromyalgia, but because the vocational expert had testified that someone who had fibromyalgia *and* could only sit for 30 minutes at a time could not engage in any work. *Id.* at 108.

In *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008), the Second Circuit specifically stated that the "mere diagnosis of fibromyalgia without a finding as to the severity of the symptoms does not mandate a finding of disability." In *Rivers*, the Second Circuit distinguished *Green-Younger*, in which the doctor had diagnosed the fibromyalgia as "severe" and the cause of "marked limitations in the claimant's daily activities." *Id.* Ms. Rivers, on the other hand was told to continue her exercise regimen on the NordicTrack and treadmill in addition to consulting with a physical therapist to treat back pain and the fibromyalgia. *Id.* The court also stated that, notwithstanding the diagnosis of fibromyalgia, the ALJ was not required to credit Rivers's testimony about the severity of her pain and the functional limitations that it caused, particularly where there is conflicting evidence about the plaintiff's pain. *Id. See also Prince v. Astrue*, No. 12-2198, slip op. at 3 (2d Cir. March 14, 2013) (citing *inter alia Rivers, supra*); *Burgos v. Astrue*, No. 3:09-CV-1216, 2010 WL 38229108, at *1-2 (D. Conn. Sept. 22, 2010) (distinguishing *Green-Younger*).

In this case, Dr. Flinkenstein diagnosed fibromyalgia on November 2, 2011,

more than one year after the ALJ's opinion.  There are only three reports mentioning fibromyalgia[22] and no indication that this plaintiff's condition was worse than previously thought, only that the diagnosis could have been fibromyalgia rather than arthritis.  If fibromyalgia were a new diagnosis, it does not relate to the time period in question, and if plaintiff's previous diagnosis of arthritis was incorrect or plaintiff had both impairments, he still performed activities that were inconsistent with disabling pain as stated above.[23]  Thus, the fact that fibromyalgia was diagnosed in November of 2011 would not mandate a remand from the Appeals Council or from this court without further limitations indicated by the record.  The court would also point out that Dr. Flinkenstein stated that plaintiff benefitted from flexeril and on November 21, 2011, Dr. McCahill stated that Lyrica was "quite helpful." (T. 226).

There is nothing in the updated medical records indicating any limitations based

---

[22] One report by Dr. Flinkenstein was dated September 23, 2011. (T. 231-33).  This was the report of plaintiff's initial visit with Dr. Flinkenstein and for a rheumatology exam. (T. 231).  This report indicates that there were fibromyalgia trigger points, but plaintiff otherwise demonstrated good passive/active range of motion. (T. 232).  Plaintiff had full strength in his upper and lower extremities.  Flexeril was added at a very low dose.  Dr. Flinkenstein characterized plaintiff's joint pain as "mild." (T. 231).  In the second report mentioning fibromyalgia, dated November 2, 2011, Dr. Flinkenstein, states that it is an "interval visit for RA, test results and monitoring of therapy." (T. 228-30).  He states that, although plaintiff still had pain, his pain had improved. (T. 228).  The doctor's assessment was that plaintiff's anthralgias "may just be related to oa and fibromyalgia." (T. 229).  Dr. Flinkenstein increased the plaintiff's prescription for Flexeril and added Lyrica. (T. 229).  The last report was from Dr. McCahill, who stated plaintiff came in because of "cold symptoms for 1 week." (T. 226-27).  In this report, Dr. McCahill mentioned in passing that Dr. Flinkenstein thought plaintiff did not have inflammatory arthritis but "maybe has fibromyalgia." (T. 226).  Dr. McCahill then stated that the Lyrica was "quite helpful." (*Id.*)

[23] Based on the two reports that mention fibromyalgia, it is unclear whether it is a new impairment or merely a new diagnosis for his previous impairment of rheumatoid arthritis.  On November 21, 2011, Dr. McCahill stated that plaintiff had seen Dr. Flinkenstein and that "he thought he did not have inflammatory arthritis *maybe* has fibromyalgia." (T. 226) (emphasis added).

upon the diagnosis of fibromyalgia. Thus, the Appeals Council did not err "as a matter of law" in denying review and in failing to send the case back to the ALJ. Based on the records, there is no evidence showing that plaintiff could not perform light work based only on diagnosis of fibromyalgia. Although plaintiff's counsel states that fibromyalgia "causes pain," the ALJ did not find that plaintiff had no pain, only that plaintiff's pain was not disabling and that to the extent that he claimed more severe pain, his claims were not credible based on the medical evidence and the plaintiff's stated activities.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**</u> *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: March 18, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge